UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** ~~500 West Madison Street, Suite 1400~~ ~~Chicago, IL 60661~~ 175 W. Jackson Boulevard, Suite 900 Chicago, IL 60604 **Plaintiff,** v. **WILLIAM F. MAHON** 231 Treherne Road Timonium, Maryland 21093 **AND DEAN J. JUPITER** ~~9560 NW 42nd Court~~ ~~Coral Springs, FL 33065~~ ~~**Defendants.**~~ Last known address:  112 Sweet Bay Circle                     Jupiter, FL  33458 **Defendants,** and **Barbara A. Jupiter** Last known address:  112 Sweet Bay Circle                     Jupiter, FL  33458 **Jillian Coen, a minor,** Last known address:  112 Sweet Bay Circle                     Jupiter, FL  33458 **Robert Coen, a minor,** Last known address:  112 Sweet Bay Circle                     Jupiter, FL  33458 | CIVIL ACTION FILE NO.  S 00 CV 2918 Judge William D. Quarles |

1

| | |
|---|---|
| **Lee Jupiter** | : |
| Inmate #9704901 | : |
| Hamilton County Correctional Institute | : |
| 10650 S.W. 46th Street | : |
| Jasper, FL  32052 | : |
| | : |
| **Sean Jupiter** | : |
| 1305 E 51st Street | : |
| Savannah, GA  31404 | : |
| | : |
| **Derek Jupiter** | : |
| 112 Sweet Bay Circle | : |
| Jupiter, FL  33458 | : |
| | : |
|          **Relief Defendants.** | : |

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF

Plaintiff, the United States Securities and Exchange Commission ("Commission"), alleges as follows:

4.      From at least 1992 through April 1997, Defendant William F. Mahon ("Mahon"), a portfolio manager for Alexander & Alexander Services Inc. ("Alexander"), engaged in a scheme to defraud by trading millions of dollars in high-risk derivative securities and concealing $62 million in losses and $35 million in gains resulting from such trading on Alexander's books and records.  This caused Alexander to materially overstate its income before adjustment for minority interest and taxes by:  37%, 88.7%, 103.9%, 60.8%, and 34.6% respectively in Alexander's March 31, 1994, June 30, 1994, September 30, 1994, June 30, 1995 and September 30, 1995 Forms 10-Q; and 17.6% and 17.8% respectively in Alexander's December 31, 1994 and December 31, 1995 Forms 10-K.  It is also caused

Alexander to materially understate its income before adjustment for minority interest and taxes by 14% and 11.3% respectively in Alexander's September 30, 1993 and June 30, 1996 Forms 10-Q.

2. Mahon purchased many of these securities through Defendant Dean J. Jupiter ("Jupiter"), a former registered representative employed by a registered broker-dealer, a registered municipal securities dealer, and their successors, in exchange for at least $190,000 in kickbacks Jupiter paid to Mahon. These transactions generated at least $14.3 million in commissions for Jupiter.

3. Jupiter has fraudulently dissipated at least some of the proceeds of his fraud by transferring assets to various domestic and foreign trusts, the beneficiaries of which include himself and some or all the relief defendants – Jupiter's wife, Barbara A. Jupiter, and her minor children, Jillan Coen and Robert Coen, and Jupiter's adult sons, Derek, Sean, and Lee Jupiter (collectively "the relief defendants.").

4. Defendant Mahon, directly and indirectly, has engaged and, unless enjoined, will continue to engage in acts, practices and courses of business which constitute violations of Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Rules 10b-5 and 13b2-1 [17 C.F.R. 240.10b-5 and 13b2-1] promulgated thereunder.

5. ~~4.~~ Defendant Jupiter, directly and indirectly, has engaged and, unless enjoined, will continue to engage in acts, practices and courses of business which constitute violations of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. 240.10b-5] promulgated thereunder.

6. The relief defendants have no rights to the proceeds of Jupiter's fraud. As beneficiaries of Jupiter's trusts, the relief defendants may have been unjustly enriched and may be unjustly enriched

in the future. Accordingly, the Commission seeks disgorgement of the unjust enrichment that the relief defendants have received or that they may in the future receive, plus prejudgment interest.

7. ~~5.~~ The Commission brings this action to enjoin such acts, practices, and courses of business pursuant to Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

## JURISDICTION AND VENUE

8. ~~6.~~ The Court has jurisdiction over this action pursuant to Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e), 78aa] and 28 U.S.C. §1331. Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa].

9. ~~7.~~ Mahon resides within the District of Maryland. Jupiter reside~~s~~d in ~~Florida.~~ Florida at the time the original complaint was filed. Sean, Derek, and Lee Jupiter reside in the United States. The last known address for Jupiter's wife and minor step-children was in Florida. It appears that Jupiter, his wife, and the minor step-children have moved to the Bahamas. The acts, practices, and courses of business constituting the violations alleged herein occurred within the jurisdiction of the United States District Court for the District of Maryland and elsewhere.

10. ~~8.~~ Mahon and Jupiter, directly and indirectly, made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein in the District of Maryland and elsewhere.

## THE DEFENDANTS

11. ~~9.~~ Mahon is a resident of Baltimore County, Maryland. At all relevant times, Mahon was the Portfolio Manager of Alexander's U.S. Treasury Operations.

12. ~~10.~~ Jupiter is a resident of Coral Springs, Florida. From 1991 through June 1996, Jupiter was a registered representative of Meridian Capital Markets, Inc., a registered municipal securities dealer, and Meridian Securities, Inc., a registered broker-dealer (collectively referred to as "Meridian"). In June 1996, Meridian merged with CoreStates Bank, N.A., and Jupiter continued to work as a registered representative of CoreStates Capital Markets, a registered municipal securities dealer, and CoreStates Securities Corp., a registered broker-dealer (collectively referred to as "CoreStates"). Jupiter resigned in September 1997 while CoreStates was conducting a review of Jupiter's trading activity with Mahon.

## THE RELIEF DEFENDANTS

13. Barbara A. Jupiter, age unknown, is Jupiter's wife. Her last known address was the Jupiter family residence in Florida. It appears that she may currently be living in the Bahamas. She is or was the beneficiary of at least one of Jupiter's trusts.

14. Jillian Coen, approximately 16-years-old, is Barbara A. Jupiter's daughter, who may be residing in the Bahamas with her mother and Jupiter. She is or was a beneficiary of at least one of Jupiter's trusts.

15. Robert Coen, approximately 12-years-old, is Barbara A. Jupiter's son, who may be residing in the Bahamas with his mother and Jupiter. He is or was a beneficiary of at least one of Jupiter's trusts.

16. Lee Jupiter, age 27, is Jupiter's son. He currently is incarcerated in Florida. He is or was a beneficiary of at least one of Jupiter's trusts.

17. Sean Jupiter, age 23, is Jupiter's son and resides in Savannah, Georgia. He is or was a beneficiary of at least one of Jupiter's trusts.

18.  Derek Jupiter, age 22, is Jupiter's son and is in the U.S. Marine Corps.  He is or was a beneficiary of at least one of Jupiter's trusts.

## BACKGROUND

19.  ~~11.~~  Alexander was a Maryland corporation with its principal offices in New York.  Alexander provided risk management, insurance brokerage and human resource management consulting services worldwide through various subsidiaries.  Alexander's two classes of securities (common and preferred stock) were registered with the Commission pursuant to Sections 12(b) and (g) of the Exchange Act and were traded on the New York and London stock exchanges.  During the relevant period, Alexander filed periodic and other informational reports with the Commission pursuant to Section 13(a) of the Exchange Act.

20.  ~~12.~~  As an insurance broker, Alexander received premium payments from its clients, which were not yet due to the insurance carriers, and claim payments from the carriers, which were not yet due to its clients.  Alexander held these payments temporarily in the form of cash or investments in a fiduciary capacity (fiduciary funds).  Pursuant to its own investment policy and state insurance regulations, Alexander was required to invest fiduciary funds in conservative, high quality, short-term securities designed to safeguard principal.

21.  ~~13.~~  Mahon was Alexander's portfolio manager of U.S. dollar investments and had delegated authority from Alexander's treasurer to invest fiduciary funds on Alexander's behalf.  Mahon also had the authority to select broker-dealers to execute these securities transactions on Alexander's behalf through non-discretionary brokerage accounts.

## **THE FRAUDULENT SCHEME**

22. ~~14.~~ Unbeknownst to Alexander, between 1992 and 1997, Mahon purchased at least 75 speculative, high risk derivatives and structured notes in violation of Alexander's investment policies and concealed $62 million in losses and $32 million in gains incurred from his trading in such securities. Mahon executed many of these transactions through Jupiter, which generated millions of dollars in commissions for Jupiter.

23. ~~15.~~ In 1992, 1993, 1994, 1995, 1996, and 1997, Mahon's securities transactions through Jupiter netted Jupiter at least $1.8 million, $4.2 million, $1.9 million, $1.7 million, $3.9 million, and $0.8 million, respectively in commissions.

24. ~~16.~~ Jupiter knew about Mahon's scheme to conceal these transactions from Alexander and, from 1993 through 1995, Jupiter paid Mahon at least $190,000 in cash to continue investing in the high-risk securities through Jupiter. Jupiter never disclosed Mahon's scheme to Alexander or his payment of $190,000 in kickbacks to Mahon.

## **THE TRADING IN HIGH RISK SECURITIES**

25. ~~17.~~ Mahon first began purchasing high-risk derivatives sometime prior to 1992. Mahon purchased these derivatives, which declined in value by approximately $1 million, from Jupiter. Mahon believed his job would be in jeopardy if Alexander discovered such losses. Mahon discussed with Jupiter how to conceal these losses from Alexander.

26. ~~18.~~ Mahon and Jupiter discussed that Mahon would sell the derivatives that declined in value and use the proceeds from the sale to buy other high-risk derivatives. They also discussed that they would conceal the $1 million in losses on Alexander's books by Jupiter

inflating the value of the new high-risk derivatives on purchase confirmations sent to Alexander in the amount of $1 million, the amount of the losses.

27. ~~19.~~ In September 1992, Jupiter met with Mahon to propose that Mahon concentrate Alexander's investments on certain high-risk mortgage-backed derivatives. During this visit, Jupiter told Mahon that he was willing to pay Mahon money to make additional investments in these high-risk securities. Mahon agreed to the kickback scheme and began purchasing high risk, mortgage backed-derivatives through Jupiter.

28. ~~20.~~ By the fall of 1993, several of these securities purchased earlier by Mahon had declined in value. In the fall of 1993, Jupiter paid Mahon $20,000 in cash to induce him to continue investing in high risk, mortgage-backed derivatives. To conceal the losses from the sale of these securities on Alexander's books and records, Mahon sold them and purchased other high-risk derivatives on the same day so he could roll the losses from the sale of the old securities into the value of the new securities.

29. ~~21.~~ Over the next two years, Jupiter made four more cash payments to Mahon to induce him to invest in the high-risk derivatives. In the spring of 1994, Jupiter gave Mahon $20,000. In the fall of 1994, Jupiter increased the payment to $50,000. In May 1995, Jupiter paid Mahon another $50,000 and told Mahon it was just another installment payment to keep the scheme going.

30. ~~22.~~ By 1994, Alexander was Jupiter's only client.

31. ~~23.~~ Neither Mahon nor Jupiter ever disclosed to Alexander that Jupiter was making the above-referenced payments to Mahon, nor did they disclose the fraudulent scheme to conceal the mounting losses resulting from the purchase and sale of the derivatives.

32. ~~24.~~ In or about May 1995, in an attempt to recoup the funds he had been hiding on Alexander's books, Mahon began liquidating the high-risk derivatives in Alexander's portfolio and purchasing structured notes. When he purchased the structured notes, Mahon improperly classified them as fixed term certificates of deposit on trade tickets he prepared. Mahon also inflated the value of the structured notes on Alexander's trade tickets to offset the losses Alexander suffered from Mahon's trading in the mortgage-backed derivatives.

33. ~~25.~~ During 1995, Mahon sold several of the structured notes, which resulted in realized gains. Rather than recognizing the gains on Alexander's books and records, however, Mahon reduced the amount of the losses he was concealing by the amount of the gains. He then inflated the value on Alexander's books and records of additional structured notes that he purchased by the amount of the remainder of the concealed losses.

34. ~~26.~~ In late 1995, Jupiter paid Mahon an additional $50,000 to induce him to purchase additional structured notes. Meanwhile, Jupiter continued to receive substantial commissions on the sales of the structured notes to Alexander and began negotiations with his supervisors to increase his share of total commissions generated on these transactions.

35. ~~27.~~ Meridian merged with CoreStates in April 1996. In May 1996, based on Jupiter's productivity, CoreStates agreed to pay Jupiter 60% of the commissions generated on all trades with Alexander after May 15, 1996. By contrast, the largest commission rate for any other CoreStates salesperson in 1996 was 47.5%.

36. ~~28.~~ In September 1996, CoreStates representatives met with Mahon in an effort to get to know Mahon and its new client, Alexander. During the meeting, the CoreStates representatives told Mahon that their policy would be to send confirmations of his trades to

someone else at Alexander in addition to Mahon. They also told Mahon that they would require additional documentation from Alexander that clearly indicated his authority to trade in structured notes on Alexander's behalf. Mahon agreed to provide the additional documentation.

37. ~~29.~~ While CoreStates was waiting for the additional documentation, Jupiter executed the sale of two additional structured notes to Mahon. After that, Mahon did not purchase any other securities transactions on behalf of Alexander through Jupiter or CoreStates. He also never provided the additional documentation to CoreStates as requested.

### CONCEALMENT OF LOSSES AND FALSIFICATION OF ALEXANDER'S BOOKS AND RECORDS

38. ~~30.~~ Mahon concealed his purchase of high-risk securities from Alexander in several ways. First, Mahon provided false information about the newly purchased securities, including the value, descriptions and maturity dates, on Alexander's internal trade tickets that he prepared to obtain authorization to purchase or sell securities. Mahon knew that Alexander's accounting department relied on the information on Mahon's trade tickets to record these transactions, and that such transactions were, as a result, being misclassified and inflated on Alexander's books and records.

39. ~~31.~~ Second, Mahon manipulated the position reports that management used to monitor its portfolio. Mahon was responsible for inputting the trading activity into Alexander's computerized treasury portfolio system, which generated these reports. Mahon input the same false information from the trade tickets into the portfolio system. Therefore, the reports it generated, including the monthly and year-end position reports, contained false information about the securities including the value, descriptions and maturity dates.

40. ~~32.~~ Mahon also concealed the losses resulting from the high risk securities, from Alexander. He inflated the purchase price of the new securities on Alexander's internal trade tickets by listing the par value rather than the actual purchase price of the new securities, which was always less than the par value. The difference between the par value and the actual purchase price was the amount of loss Mahon concealed on Alexander's books.

41. ~~33.~~ On certain occasions, low level accounting department personnel questioned Mahon about difference between the par value and the price paid. Mahon told them it was the result of either errors by the bank or a "netting" of the securities he had bought and sold. Mahon also told them that the difference between par value and price was irrelevant. Accounting personnel accepted Mahon's explanations and recorded entries on Alexander's books and accounts based on them. After a while, they stopped questioning Mahon's explanations.

42. ~~34.~~ Sometimes Mahon's scheme required that he prepare multiple trade tickets for the same transaction. Mahon told the internal accountants not to worry about the numbers matching Alexander's daily cash balance for each individual trade ticket because when several trade tickets were "netted" together, everything balanced. Mahon even provided schedules to accounting personnel and instructed them how to record these "netting" transactions.

43. ~~35.~~ Eventually, Mahon trained the accounting personnel to look for trade tickets that netted together in order to match the cash transactions. Accounting personnel monitored the cash balances of bank accounts Mahon used to trade on a daily basis. If the transactions recorded did not match the balance, they would ask Mahon for an explanation. Many times, Mahon would prepare trade tickets while they waited, which would eliminate the balance discrepancies.

44. ~~36.~~ In addition to preparing false trade tickets and position reports, Mahon used intercompany transactions to conceal discovery of his scheme. Specifically, Mahon sold high-risk derivatives in Alexander's portfolio from one Alexander entity to another at inflated values to create additional records to "legitimize" the original fraudulently recorded transactions. Other than to conceal the scheme, there was no legitimate purpose for the intercompany sales. However, when questioned about the intercompany sales by Alexander's treasury or accounting personnel, Mahon explained that he needed to sell maturing securities to other Alexander entities because the originating entities needed to meet minimum cash balance requirements.

45. ~~37.~~ To further conceal his scheme, Mahon arranged for some banks and broker-dealers, including Jupiter's firm, to send trade confirmations and monthly statements of account activity directly to him. These confirmations and monthly statements contained the true values and descriptions of securities Mahon purchased.

46. ~~38.~~ Jupiter participated in Mahon's scheme by paying cash kickbacks to Mahon to induce Mahon to trade through Jupiter in knowing disregard of Mahon's duties to Alexander.

47. ~~39.~~ Jupiter was the registered representative for all of Alexander's brokerage accounts with Meridian and CoreStates.

48. ~~40.~~ As the registered representative on Alexander's accounts, Jupiter had a duty to deal fairly with Alexander and to give Alexander any information relevant to the affairs entrusted to him of which he had notice.

49. ~~41.~~ Jupiter violated his duty of fair dealing and relationship of trust and confidence with Alexander by paying Mahon kickbacks in exchange for Alexander's business

and by failing to disclose the kickbacks or his knowledge of Mahon's fraudulent activities to Alexander.

## DECEPTION OF ALEXANDER'S OUTSIDE AUDITORS

50. ~~42.~~ Mahon lied to and provided false records to Alexander's outside auditors. In 1994 and 1995, when questioned about the nature of securities in Alexander's portfolio, Mahon told the outside auditors that Alexander did not trade in mortgage-backed securities. In fact, Alexander had several high risk, mortgaged backed securities in its portfolio at year-end 1994 and 1995.

51. ~~43.~~ In addition, during at least 1994 and 1995, Mahon provided the outside auditors with inaccurate year-end portfolio reports and other reports generated by Mahon through Alexander's investment portfolio system. The portfolio reports contained false purchase prices, descriptions and maturity dates.

52. ~~44.~~ In early 1995, the outside auditors questioned Mahon about the nature of at least one high-risk derivative in Alexander's portfolio at year-end. Mahon misrepresented to the outside auditors that the high-risk derivative was a conservative instrument.

## DISCOVERY OF THE SCHEME

53. ~~45.~~ On January 15, 1997, Aon Corp. ("Aon"), through one of its wholly owned subsidiaries, acquired all of the outstanding shares of Alexander's common stock, and on January 17, 1997, all of the outstanding shares of Alexander's preferred stock. On March 11, 1997, Alexander terminated its registration with the Commission pursuant to Section 12(g) of the Exchange Act. Aon purchased Alexander in January 1997. In April 1997, Aon terminated most of Alexander's treasury department employees, including Mahon.

54. ~~46.~~ In May 1997, after CoreStates learned of Mahon's departure, it requested a meeting with Aon to make sure Aon knew about the two outstanding structured notes on Alexander's portfolio. After CoreStates informed Aon of the structured notes, Aon began investigating Alexander's securities portfolio and eventually uncovered Mahon's fraudulent scheme.

55. ~~47.~~ In August 1997, Aon confronted Mahon, who confessed to the scheme.

56. ~~48.~~ Aon subsequently sold the remaining structured notes in Alexander's portfolio and during the second quarter of 1997, took a charge against its second quarter earnings for $27 million to cover the remainder of Alexander's hidden losses. This caused Aon's second quarter earnings to drop 2.4% from the prior year.

**MATERIAL MISSTATEMENTS IN ALEXANDER'S FORMS 10-Q & 10-K**

57. ~~49.~~ Mahon's fraudulent scheme resulted in the concealment of $62 million of losses on Alexander's books. This caused Alexander to materially overstate its pre-tax income by: 37%, 88.7%, 103.9%, 60.8%, and 34.6% respectively in Alexander's March 31 1994, June 30, 1994, September 30, 1994, June 30, 1995 and September 30, 1995 Forms 10-Q; and 17.6% and 17.8% respectively in Alexander's December 31, 1994 and December 31, 1995 Forms 10-K.

58. ~~50.~~ Mahon used gains from the sales of the structured notes (and certain other securities) to reduce the amount of the hidden losses on Alexander's books, so the scheme also resulted in the concealment of $35 million in gains. This caused Alexander to materially understate its income before taxes and minority interest by 14% and 11.3% respectively in Alexander's September 30, 1993 and June 30, 1996 Forms 10-Q.

## COUNT I

### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder

59. ~~51.~~ Paragraphs 1 through ~~50~~58 are realleged and incorporated by reference as if set forth fully herein.

60. ~~52.~~ Beginning in at least fiscal year 1992 through at least April 1997, Mahon and Jupiter, in connection with the purchase and sale of securities on behalf of Alexander, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, of the mails, and of the facilities of a national securities exchange: employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated as a fraud and deceit upon purchasers and sellers of such securities.

61. ~~53.~~ Mahon and Jupiter knew or were reckless in not knowing of the activities described in paragraphs 1 through ~~50~~58 above.

62. ~~54.~~ By reason of the activities described in paragraphs ~~5~~59 through ~~53~~61 above, Mahon and Jupiter violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. 240.10b-5] promulgated thereunder.

## COUNT II

### Violations of Exchange Act Rule 13b2-1

63. ~~55.~~ Paragraphs 1 through 5~~0~~8 are realleged and incorporated by reference as if set forth fully herein.

64. ~~56.~~ Beginning in at least fiscal year 1992 through at least April 1997, Mahon, directly and indirectly, falsified or caused to be falsified books, records, and accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

65. ~~57.~~ By reason of the activities described in paragraphs 63~~55~~ and 64~~56~~ above, Mahon violated Rule 13b2-1 [17 C.F.R. 240.13b2-1] promulgated under Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

## COUNT III

### Violations of Section 13(b)(5) of the Exchange Act

66. ~~58.~~ Paragraphs 1 through 5~~0~~8 are realleged and incorporated by reference as if set forth fully herein.

67. ~~59.~~ Beginning in at least fiscal year 1992 through at least April 1997, Mahon knowingly circumvented a system of internal accounting controls and knowingly falsified books, records, and accounts described in Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

68. ~~60.~~ By reason of the activities described in paragraphs 66~~58~~ and 67~~59~~ above, Mahon violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

## COUNT IV

### Claims Against the Relief Defendants as Custodians of Ill-Gotten Gains

69. Paragraphs 1 through 58 are realleged and incorporated by reference as if set forth fully herein.

70. The relief defendants received and/or will receive, directly or indirectly, funds and/or other benefits from Jupiter, which either are the proceeds of, or are traceable to the proceeds of, the unlawful activities alleged herein and to which they have no legitimate claim.

71. The relief defendants obtained or will obtain the funds and/or property as part of and in furtherance of the securities violations alleged and under circumstances in which it is not just, equitable, or conscionable for them to retain the funds and other benefits, and accordingly, each has been unjustly enriched and may in the future be unjustly enriched further.

72. The Commission is entitled to an order requiring that the relief defendants repatriate and disgorge any funds and benefits plus prejudgment interest thereon previously or prospectively received from Jupiter.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that the Court:

### I.

Issue findings of fact and conclusions of law that the Defendants committed the violations charged and alleged herein.

### II.

Issue an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Mahon, his officers, agents, servants, employees, attorneys and those persons in active concert or participation with him who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 10(b) and 13(b)(5) of

the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Rules 10b-5 and 13b2-1 [17 C.F.R. 240.10b-5 and 240.13b2-1 promulgated thereunder.

III.

Issue an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Jupiter, his officers, agents, servants, employees, attorneys and those persons in active concert or participation with him who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 promulgated thereunder.

IV.

Issue an Order requiring Defendants disgorge the ill-gotten gains that they received as a result of their wrongful conduct, plus prejudgment interest thereon, including but not limited to, the kickbacks Mahon received from Jupiter during the period 1993 through 1995 and the commissions Jupiter received from Mahon's securities transactions during the period 1992 through 1997.

V.

Issue an Order requiring Jupiter to take such steps as are necessary to repatriate to the territory of the United States all assets in which he has a direct, indirect, or beneficial interest and requiring the relief defendants to take such steps as are necessary to repatriate to the territory of the United States all assets held in any trusts created by or at the request of Jupiter for which they are beneficiaries (whether held by them or under

their direct or indirect control, jointly or individually, or otherwise) and to provide the Commission and the Court a written description of the funds and assets so repatriated.

## VI.

Issue an Order requiring the relief defendant to disgorge any ill-gotten gains that they have received or in the future will receive, plus prejudgment interest thereon, including, but not limited to any payments received from Jupiter, whether directly or as a beneficiary of one of Jupiter's trusts.

## VII.

With regard to the Defendants' violative acts, practices and courses of business set forth herein, issue an Order imposing upon them appropriate civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VIII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## ~~VII~~IX.

Grant Orders for such further relief as the Court may deem appropriate.

Respectfully Submitted,

Dated:           ~~September ___, 2000~~ _____

                 _____

_____  Carolann Gemski

One of the Attorneys for Plaintiff
U.S. Securities and Exchange Commission
~~500 W. Madison Street, Suite 1400~~
175 W. Jackson Blvd., Suite 900
Chicago, IL ~~60661-2511~~60604
(312) 353-7390 (phone)
(312) 353-7398 (fax)