# Exhibit A

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. WDQ-00-2918

UNITED STATES SECURITIES and
EXCHANGE COMMISSION,

        Plaintiff,

vs.

WILLIAM F. MAHON and
DEAN J. JUPITER,

        Defendants.
_____/

                  Wednesday, May 5, 2004
                  500 E. Broward Boulevard
                  Suite 700
                  Fort Lauderdale, Florida
                  9:44 a.m. to 1:13 p.m.

DEPOSITION OF LAWRENCE W. LEGEL

Taken before Darline M. West,

Registered Professional Reporter, Notary Public

in and for the State of Florida At Large,

pursuant to Notice of Taking Deposition filed

by the Plaintiffs in the above cause.

                  - - -



```
                                                              2
 1   APPEARANCES:

 2

         UNITED STATES SECURITIES
 3       AND EXCHANGE COMMISSION
         175 W. Jackson Boulevard
 4       Suite 900
         Chicago, Illinois  60604
 5       Phone:  (312) 353-7390
         By:  CAROLANN GEMSKI, ESQ.
 6            and PAUL A. MONTOYA, ESQ.
         On behalf of the Plaintiffs
 7


 8       LAW OFFICES OF ALAN M. LERNER
         2888 East Oakland Park Boulevard
 9       Fort Lauderdale, Florida  33306
         Phone:  (954) 563-8522
10       By:  ALLAN M. LERNER, ESQ.
         On behalf of the Defendant,
11       Dean J. Jupiter

12

         M. DANIEL HUGHES, P.A.
13       3000 North Federal Highway
         Building Two, Suite 200
14       Fort Lauderdale, Florida  33306
         Phone:  (954) 566-3390
15       By:  M. DANIEL HUGHES, ESQ.
         On behalf of the witness,
16       LAWRENCE W. LEGEL

17                       - - -
                       I N D E X
18
     WITNESS:  DEAN J. JUPITER
19
                                              PAGE:LINE
20   DIRECT EXAMINATION
     BY MS. GEMSKI............................ 4:5
21   DIRECT EXAMINATION (Continued)
     BY MR. MONTOYA........................... 128:6
22

23                     E X H I B I T S

                                              PAGE:LINE
24

25   Plaintiff's Exhibit 1..................... 90:4
```

H. Allen Benowitz - Jessica R. Berman - Peggy Cook - Matz, Traktman, Feldman & Wildner - Ivy Court Reporting
19 West Flagler Street, Suite 1020   A Veritext Company   (305) 376-8800

```
 1  THEREUPON,
 2              LAWRENCE W. LEGEL,
 3  called as a witness on behalf of the Plaintiff,
 4  herein, having been first duly sworn was examined
 5  and testified as follows:
 6          THE WITNESS:  Yes, I do.
 7          MS. GEMSKI:  We are on the record at
 8      9:44 a.m. on Wednesday, May 5th.  My name is
 9      Carolann Gemski.  With me is Paul Montoya.
10      I'm an attorney and Paul is a branch chief
11      with the Division of Enforcement of the
12      United States Securities and Exchange
13      Commission.
14          Madam Court Reporter, can you please
15      identify yourself for the record?
16          THE COURT REPORTER:  My name is
17      Darline West.  I work for the firm of
18      Veritext in Miami, Florida.
19          MS. GEMSKI:  We are here for the purpose
20      of taking the deposition of Larry Legel in
21      the matter of SEC versus William F. Mahon and
22      Dean J. Jupiter, Case No. 00 CV 2918 in the
23      United States District Court for the District
24      of Florida.
25  THEREUPON,
```

31

A. He is or was the trustee for a trust in which Dean was either a beneficiary of or a grantor of or his family were beneficiaries of.

Q. And what trust are you referring to?

A. I'm referring to two trusts. One of them is called the Dean J. Jupiter Trust.

Q. And the other is called?

A. The other had a name change. I don't know what the new name of it is. But it used to be called the Trophy Trust. I know the name was changed, but I don't know what it was.

Q. When was the name changed?

A. It was either in the year 2000 or late in the year 2002. It was probably in the year 2000 -- I'm sorry. I said it wrong. Probably in the year 2003. Could have been as far back ago as late 2002.

Q. Why was the name changed?

A. I don't know.

Q. Does the name Guerdon, G-U-E-R-D-O-N, Trust ring a bell to you?

A. Yes.

Q. Was that the name of the new trust?

A. Yes.

Q. Did you ever have any conversations

1    A.    Out of conservatism.

2    Q.    I want to go back to some of the things
3  you just described.  You said that Dean and
4  Barbara Jupiter were the grantors.  Can you tell
5  me what that means to you?

6    A.    By definition, a trust has to have a
7  party that paid funds into the trust to create
8  the trust.  That was Dean Jupiter.

9    Q.    Did Dean Jupiter tell you what the
10 purpose of the Dean J. Jupiter Trust was?

11   A.    Yes.  To get a better return on his
12 investment dollar than he was getting through the
13 investments that he had previously been involved
14 with.

15   Q.    Was that what he told you -- well, let
16 me back up.  When was the Dean J. Jupiter Trust
17 created?

18   A.    1997.

19   Q.    And the objective you just described to
20 me for the creation of the Dean J. Jupiter Trust,
21 was that the objective at the time the trust was
22 created?

23   A.    Yes.  We had received information from
24 Bahamian investment advisors that they could
25 provide a high return on investment, and Dean

wanted to set up funds for the benefit of his children, long-term estate tax planning, traditional standard maneuvers, and told me that he was going to get a substantial return on his investment, which he never did.

Q. Did you at any time ask him if his objectives for the Dean J. Jupiter Trust had changed from what he told you at the time it was created?

A. We discussed it many times, the issue of what his objectives were, and his objectives were to provide long-term transfer of net worth to his children and to get a high return on his investment because he had -- was not doing so well with this investments through Merrill Lynch in the U.S.

Q. Did you ever have a conversation with Mr. Jupiter relating to the Dean J. Jupiter Trust that in any way referenced avoiding attachment by the U.S. Government of his assets?

A. Yes.

Q. Can you tell me about those conversations?

A. He was advised by the Bahamian group that their banking privacy laws protected his

38

1  investment in the Bahamas from any outside
2  jurisdiction. I was present at meetings where
3  they said that. "They" being a number of
4  different people over time.
5      Q.  Okay. When you say "outside
6  jurisdiction," what does that mean to you?
7      A.  Anything outside of the Bahamas.
8      Q.  When you say the Bahamian group, can
9  you tell me to whom you are referring?
10     A.  Over the years there were at least a
11 dozen different people involved. Would you like
12 me to try and recite who those were?
13     Q.  Well, why don't you just identify for
14 me the ones that Mr. Jupiter eventually ended up
15 doing business with?
16     A.  James Hoar, H-O-A-R, Koors -- not
17 Koors, Coutts -- Coutts & Company, C-O-U-T-T-S.
18 Coutts & Company, they were a wholly-owned
19 subsidiary of one of the world's largest banks in
20 London, which is Nat West, N-A-T -- that's a
21 short term -- maybe it's National Westminster.
22 But they call it Nat West. That's what I know it
23 by, Nat West. The London World Class Bank owned
24 a subsidiary in Nassau called Coutts & Company.
25 James Hoar was their senior vice-president.

1   before October?

2   THE WITNESS: I do. Although I haven't
3   scheduled the preparation of those returns
4   yet because I don't have the information and
5   because I'm very busy, for those two reasons.
6   MR. MONTOYA: Do you know the current
7   balance of assets in the Guerdon Trust that
8   we've talked about?
9   THE WITNESS: No.
10  MR. MONTOYA: Can you give me an
11  estimate as to what the value --
12  THE WITNESS: An estimate is about
13  800,000.
14  MR. MONTOYA: $800,000?
15  THE WITNESS: Yes.
16  MR. MONTOYA: I'm going to ask you, as
17  Miss Gemski pointed out earlier, to please
18  wait until I finish a question before you
19  respond.
20  BY MS. GEMSKI:
21  Q. When you were answering Mr. Montoya's
22  questions, you said you haven't gotten the
23  information you need, in other words, to file the
24  tax returns related to Dean Jupiter. What
25  information are you referring to?

56

1  A. No.

2  Q. Other than yourself, do you know of any
3  of -- any other protectors for the
4  Dean J. Jupiter Trust or the Trophy Trust/Guerdon
5  Trust?

6  A. There were protectors before me and
7  after me. I don't know who they are. Alan Cole,
8  at one time, was a protector when he wasn't a
9  trustee, when he was between license renewals.

10  Q. When you say "between license
11  renewals," what --

12  A. He had a regulatory problem in the
13  Bahamas where he couldn't serve as a trustee
14  because the corporation that he worked for had a
15  licensing issue with their regulators, and he had
16  to find a substitute trustee in the interim
17  period. And during that substitute era, he
18  became the protector, individually was the
19  protector. I remember that.

20  Q. Do you have any knowledge about the
21  Dean J. Jupiter Homestead Trust?

22  A. Yes.

23  Q. Can you tell me what that is?

24  A. Dean J. Jupiter and Barbara Jupiter
25  sold their house in Coral Springs, Florida, and

1  the proceeds went into that homestead trust you
2  named.
3      Q.   Did Mr. Jupiter tell you why that was
4  set up that way?
5      A.   I was very much involved with it.
6  Barbara Jupiter was interested in protecting her
7  marital asset and her rights to the proceeds of
8  which there were many rights that she had.  And
9  she imposed upon me to find the right attorney to
10 do the right things with the proceeds, and we
11 retained counsel, and counsel set up homestead
12 trust.
13     Q.   And the counsel you're referring to is
14 who?
15     A.   There were two.  Dan Hughes was one,
16 and Ed Phillips was another.
17     Q.   And to your knowledge, were the
18 proceeds of the sale of the Jupiter home put into
19 the Jupiter Homestead Trust?
20     A.   Yes.
21     Q.   And as of today, are there any assets
22 in the Jupiter homestead trust?
23     A.   No.
24     Q.   And how is it that you know there's no
25 assets in that trust?

58

1  A. Because by definition, the trust can
2  only exist for six months. I was told six months
3  was the termination of the trust. The funds were
4  in there for six months.
5  Q. How much funds were put in the
6  Dean Jupiter Trust? Pardon me. I'll start that
7  question all over again.
8       How much proceeds of the sale of the
9  Jupiter home were put into the Jupiter Homestead
10 Trust?
11 A. All of the proceeds from the sale of
12 the residence, which I will estimate at $1.2
13 million.
14 Q. And what happened to the money from
15 there?
16 A. It was transferred at Barbara Jupiter's
17 direction into another foreign trust.
18 Q. Which was which trust?
19 A. Which at that time was the Trophy
20 Trust.
21 Q. And what is the balance in the Trophy
22 Trust today?
23 A. I don't know, but I had guessed earlier
24 for Paul that it was 800,000. The last time I
25 saw a report, it was in that range, 800,000.

```
 1      Q.   When was the last time you saw that
 2  report?
 3      A.   Well, a year ago when I did the tax
 4  return.
 5      Q.   Have you ever heard of anything called
 6  the Jupiter Family Trust?
 7      A.   Yes.
 8      Q.   Can you tell me what you know about
 9  that?
10      A.   It was basically a nonevent.  It was
11  formed maybe in the early '90s, and it was never
12  used.  It was like -- it was -- the intention of
13  it was to put assets into it as a family trust,
14  but I don't think it was ever used.  If it was,
15  it wasn't significant.
16      Q.   You've talked previously about filing
17  tax returns on the Jupiter-related trusts.  Would
18  those tax returns have reflected all of the
19  distributions of assets out of those trusts
20  during the reporting year?
21      A.   Yes.
22      Q.   Okay.  Do you know of any disbursement
23  of any assets from any of the Jupiter-related
24  trust funds for the tax year 2003?
25      A.   Yes.
```