# Exhibit A

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF FLORIDA

2           CASE NO. WDQ-00-2918

3
UNITED STATES SECURITIES and
4   EXCHANGE COMMISSION,

5              Plaintiff,                    **COPY**

6
vs.
7
WILLIAM F. MAHON and
8   DEAN J. JUPITER,

9              Defendants.
    _____/

10

11                        Wednesday, May 5, 2004
                          500 E. Broward Boulevard
12                        Suite 700
                          Fort Lauderdale, Florida
13                        9:44 a.m. to 1:13 p.m.

14

15

16          DEPOSITION OF LAWRENCE W. LEGEL

17       Taken before Darline M. West,

18   Registered Professional Reporter, Notary Public

19   in and for the State of Florida At Large,

20   pursuant to Notice of Taking Deposition filed

21   by the Plaintiffs in the above cause.

22                  -   -   -

23

24

25

EXHIBIT
A

2

```
 1  APPEARANCES:

 2

 3       UNITED STATES SECURITIES
         AND EXCHANGE COMMISSION
         175 W. Jackson Boulevard
 4       Suite 900
         Chicago, Illinois  60604
 5       Phone:  (312) 353-7390
         By:  CAROLANN GEMSKI, ESQ.
 6            and PAUL A. MONTOYA, ESQ.
         On behalf of the Plaintiffs
 7

 8       LAW OFFICES OF ALAN M. LERNER
         2888 East Oakland Park Boulevard
 9       Fort Lauderdale, Florida  33306
         Phone:  (954) 563-8522
10       By:  ALLAN M. LERNER, ESQ.
         On behalf of the Defendant,
11       Dean J. Jupiter

12

13       M. DANIEL HUGHES, P.A.
         3000 North Federal Highway
         Building Two, Suite 200
14       Fort Lauderdale, Florida  33306
         Phone:  (954) 566-3390
15       By:  M. DANIEL HUGHES, ESQ.
         On behalf of the witness,
16       LAWRENCE W. LEGEL

17                       -  -  -
                     I N D E X
18

    WITNESS:  DEAN J. JUPITER
19
                                      PAGE:LINE
20  DIRECT EXAMINATION
    BY MS. GEMSKI............................ 4:5
21  DIRECT EXAMINATION (Continued)
    BY MR. MONTOYA.......................... 128:6
22

23               E X H I B I T S

24                                    PAGE:LINE

25  Plaintiff's Exhibit 1.................... 90:4
```

3

```
 1   THEREUPON,

 2              LAWRENCE W. LEGEL,

 3   called as a witness on behalf of the Plaintiff,

 4   herein, having been first duly sworn was examined

 5   and testified as follows:

 6              THE WITNESS:  Yes, I do.

 7              MS. GEMSKI:  We are on the record at

 8        9:44 a.m. on Wednesday, May 5th.  My name is

 9        Carolann Gemski.  With me is Paul Montoya.

10        I'm an attorney and Paul is a branch chief

11        with the Division of Enforcement of the

12        United States Securities and Exchange

13        Commission.

14              Madam Court Reporter, can you please

15        identify yourself for the record?

16              THE COURT REPORTER:  My name is

17        Darline West.  I work for the firm of

18        Veritext in Miami, Florida.

19              MS. GEMSKI:  We are here for the purpose

20        of taking the deposition of Larry Legel in

21        the matter of SEC versus William F. Mahon and

22        Dean J. Jupiter, Case No. 00 CV 2918 in the

23        United States District Court for the District

24        of Florida.

25   THEREUPON,
```

31

         A.    He is or was the trustee for a trust in
which Dean was either a beneficiary of or a
grantor of or his family were beneficiaries of.

         Q.    And what trust are you referring to?

         A.    I'm referring to two trusts.  One of
them is called the Dean J. Jupiter Trust.

         Q.    And the other is called?

         A.    The other had a name change.  I don't
know what the new name of it is.  But it used to
be called the Trophy Trust.  I know the name was
changed, but I don't know what it was.

         Q.    When was the name changed?

         A.    It was either in the year 2000 or late
in the year 2002.  It was probably in the year
2000 -- I'm sorry.  I said it wrong.  Probably in
the year 2003.  Could have been as far back ago
as late 2002.

         Q.    Why was the name changed?

         A.    I don't know.

         Q.    Does the name Guerdon, G-U-E-R-D-O-N,
Trust ring a bell to you?

         A.    Yes.

         Q.    Was that the name of the new trust?

         A.    Yes.

         Q.    Did you ever have any conversations

36

A.    Out of conservatism.

Q.    I want to go back to some of the things you just described.  You said that Dean and Barbara Jupiter were the grantors.  Can you tell me what that means to you?

A.    By definition, a trust has to have a party that paid funds into the trust to create the trust.  That was Dean Jupiter.

Q.    Did Dean Jupiter tell you what the purpose of the Dean J. Jupiter Trust was?

A.    Yes.  To get a better return on his investment dollar than he was getting through the investments that he had previously been involved with.

Q.    Was that what he told you -- well, let me back up.  When was the Dean J. Jupiter Trust created?

A.    1997.

Q.    And the objective you just described to me for the creation of the Dean J. Jupiter Trust, was that the objective at the time the trust was created?

A.    Yes.  We had received information from Bahamian investment advisors that they could provide a high return on investment, and Dean

37

1  wanted to set up funds for the benefit of his

2  children, long-term estate tax planning,

3  traditional standard maneuvers, and told me that

4  he was going to get a substantial return on his

5  investment, which he never did.

6      Q.    Did you at any time ask him if his

7  objectives for the Dean J. Jupiter Trust had

8  changed from what he told you at the time it was

9  created?

10     A.    We discussed it many times, the issue

11 of what his objectives were, and his objectives

12 were to provide long-term transfer of net worth

13 to his children and to get a high return on his

14 investment because he had -- was not doing so

15 well with this investments through Merrill Lynch

16 in the U.S.

17     Q.    Did you ever have a conversation with

18 Mr. Jupiter relating to the Dean J. Jupiter Trust

19 that in any way referenced avoiding attachment by

20 the U.S. Government of his assets?

21     A.    Yes.

22     Q.    Can you tell me about those

23 conversations?

24     A.    He was advised by the Bahamian group

25 that their banking privacy laws protected his

38

1   investment in the Bahamas from any outside

2   jurisdiction.   I was present at meetings where

3   they said that.   "They" being a number of

4   different people over time.

5        Q.    Okay.   When you say "outside

6   jurisdiction," what does that mean to you?

7        A.    Anything outside of the Bahamas.

8        Q.    When you say the Bahamian group, can

9   you tell me to whom you are referring?

10       A.    Over the years there were at least a

11  dozen different people involved.   Would you like

12  me to try and recite who those were?

13       Q.    Well, why don't you just identify for

14  me the ones that Mr. Jupiter eventually ended up

15  doing business with?

16       A.    James Hoar, H-O-A-R, Koors -- not

17  Koors, Coutts -- Coutts & Company, C-O-U-T-T-S.

18  Coutts & Company, they were a wholly-owned

19  subsidiary of one of the world's largest banks in

20  London, which is Nat West, N-A-T -- that's a

21  short term -- maybe it's National Westminster.

22  But they call it Nat West.   That's what I know it

23  by, Nat West.   The London World Class Bank owned

24  a subsidiary in Nassau called Coutts & Company.

25  James Hoar was their senior vice-president.

47

1    before October?

2        THE WITNESS:  I do.  Although I haven't

3    scheduled the preparation of those returns

4    yet because I don't have the information and

5    because I'm very busy, for those two reasons.

6        MR. MONTOYA:  Do you know the current

7    balance of assets in the Guerdon Trust that

8    we've talked about?

9        THE WITNESS:  No.

10       MR. MONTOYA:  Can you give me an

11   estimate as to what the value --

12       THE WITNESS:  An estimate is about

13   800,000.

14       MR. MONTOYA:  $800,000?

15       THE WITNESS:  Yes.

16       MR. MONTOYA:  I'm going to ask you, as

17   Miss Gemski pointed out earlier, to please

18   wait until I finish a question before you

19   respond.

20   BY MS. GEMSKI:

21       Q.   When you were answering Mr. Montoya's

22   questions, you said you haven't gotten the

23   information you need, in other words, to file the

24   tax returns related to Dean Jupiter.  What

25   information are you referring to?

56

1    A.    No.

2    Q.    Other than yourself, do you know of any

3    of -- any other protectors for the

4    Dean J. Jupiter Trust or the Trophy Trust/Guerdon

5    Trust?

6    A.    There were protectors before me and

7    after me.  I don't know who they are.  Alan Cole,

8    at one time, was a protector when he wasn't a

9    trustee, when he was between license renewals.

10    Q.    When you say "between license

11    renewals," what --

12    A.    He had a regulatory problem in the

13    Bahamas where he couldn't serve as a trustee

14    because the corporation that he worked for had a

15    licensing issue with their regulators, and he had

16    to find a substitute trustee in the interim

17    period.  And during that substitute era, he

18    became the protector, individually was the

19    protector.  I remember that.

20    Q.    Do you have any knowledge about the

21    Dean J. Jupiter Homestead Trust?

22    A.    Yes.

23    Q.    Can you tell me what that is?

24    A.    Dean J. Jupiter and Barbara Jupiter

25    sold their house in Coral Springs, Florida, and

1  the proceeds went into that homestead trust you

2  named.

3      Q.  Did Mr. Jupiter tell you why that was

4  set up that way?

5      A.  I was very much involved with it.

6  Barbara Jupiter was interested in protecting her

7  marital asset and her rights to the proceeds of

8  which there were many rights that she had.  And

9  she imposed upon me to find the right attorney to

10  do the right things with the proceeds, and we

11  retained counsel, and counsel set up homestead

12  trust.

13      Q.  And the counsel you're referring to is

14  who?

15      A.  There were two.  Dan Hughes was one,

16  and Ed Phillips was another.

17      Q.  And to your knowledge, were the

18  proceeds of the sale of the Jupiter home put into

19  the Jupiter Homestead Trust?

20      A.  Yes.

21      Q.  And as of today, are there any assets

22  in the Jupiter homestead trust?

23      A.  No.

24      Q.  And how is it that you know there's no

25  assets in that trust?

58

1      A.    Because by definition, the trust can

2  only exist for six months.  I was told six months

3  was the termination of the trust.  The funds were

4  in there for six months.

5      Q.    How much funds were put in the

6  Dean Jupiter Trust?  Pardon me.  I'll start that

7  question all over again.

8            How much proceeds of the sale of the

9  Jupiter home were put into the Jupiter Homestead

10 Trust?

11     A.    All of the proceeds from the sale of

12 the residence, which I will estimate at $1.2

13 million.

14     Q.    And what happened to the money from

15 there?

16     A.    It was transferred at Barbara Jupiter's

17 direction into another foreign trust.

18     Q.    Which was which trust?

19     A.    Which at that time was the Trophy

20 Trust.

21     Q.    And what is the balance in the Trophy

22 Trust today?

23     A.    I don't know, but I had guessed earlier

24 for Paul that it was 800,000.  The last time I

25 saw a report, it was in that range, 800,000.

1    Q.    When was the last time you saw that
2    report?

3    A.    Well, a year ago when I did the tax
4    return.

5    Q.    Have you ever heard of anything called
6    the Jupiter Family Trust?

7    A.    Yes.

8    Q.    Can you tell me what you know about
9    that?

10    A.    It was basically a nonevent.  It was
11    formed maybe in the early '90s, and it was never
12    used.  It was like -- it was -- the intention of
13    it was to put assets into it as a family trust,
14    but I don't think it was ever used.  If it was,
15    it wasn't significant.

16    Q.    You've talked previously about filing
17    tax returns on the Jupiter-related trusts.  Would
18    those tax returns have reflected all of the
19    distributions of assets out of those trusts
20    during the reporting year?

21    A.    Yes.

22    Q.    Okay.  Do you know of any disbursement
23    of any assets from any of the Jupiter-related
24    trust funds for the tax year 2003?

25    A.    Yes.