UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

U.S. Securities & Exchange Commission,

                                       Civil Action
        Plaintiff,                   CASE No. S 00 CV 2918

vs.                                    Judge William D. Quarles

William F. Mahon and
Dean J. Jupiter

             Defendants,
_____/

## DEFENDANT DEAN J. JUPITER'S RESPONSE AND MEMORANDUM IN OPPOSITION TO SEC'S MOTION FOR A REPATRIATION ORDER AGAINST DEFENDANT DEAN JUPITER

The Defendant, Dean J. Jupiter ("Jupiter"), by and through his undersigned counsel, files this Response and Memorandum in Opposition to that portion of the Securities and Exchange Commission's ("SEC") Motion for a Final Judgment which pertains to a Repatriation Order, and that portion of the motion which seeks entry of a final judgment incorporating such relief against Jupiter. The parties have consented to the Court deciding the disputed repatriation issue on the papers without the necessity of a hearing.

### SUMMARY OF JUPITER'S OPPOSITION TO REPATRIATION ORDER

Although long aware of Jupiter's precarious financial condition based on discovery and the existence of assets abroad which at some time previous in time may have been under Jupiter's control in the United States, the SEC waited for years until the eve of entry of judgment to seek a repatriation order regarding assets located abroad. The SEC seeks the repatriation order before it actually enforces its just recently sought final judgment. Because the evidence shows that the overseas assets were not placed there to evade execution of judgment by the SEC, it is premature for this Court to enter a repatriation order before the SEC has pursued its judgment by conventional

Issuance of a repatriation order by this Court is discretionary and is not compelled by statute. In exercising its discretion, the Court should consider, among other things, the timeliness of the SEC's motion, the purposes for which the foreign trusts were created, Jupiter's cooperation in this litigation, and the absence of proof by the SEC at this stage that it requires a repatriation order to enforce its consented-to judgment.[1]

## PRELIMINARY STATEMENT

On May 2, 2005, the SEC filed a Partial Consent Motion to request final judgment setting disgorgement, civil penalty, and prejudgement interest against Jupiter. Specifically, the SEC requested $14,221,185 in disgorgement, $110,000 in civil penalties, and $15,846,389 in prejudgement interest. This brings the settlement to a total of $30,177,574. The parties have reached a settlement and agreed on this figure. The SEC and Jupiter, however, was unable to reach an agreement regarding the entry of a repatriation order, but has agreed to submit the issue to this Court for disposition by motion. The Court provided by its order of May 10, 2005, that Jupiter's Response opposing an order regarding repatriation should be filed by May 27, 2005.

### Facts

The SEC filed this action on September 28, 2000, following a lengthy formal investigation.

---

[1] Although there is little Fourth Circuit law governing the issuance of repatriation orders, Judge Messitte recently addressed the issues surrounding issuance of a preliminary injunction requiring repatriation of assets during the pendency of an action by the FTC. *See FTC v. Ameridebt, Inc.*, 2005 WL 1114707 (5/9/2005)(where FTC sought order near start of litigation and where the evidence showed that the defendant was engaged in ongoing efforts to dissipate assets, the court held that "the possibility of effective relief at the end of the litigation requires. . . a repatriation of all transferred assets before they are completely dissipated"). In contrast to that case, here the litigation is nearly over and there is no proof that effective relief requires a repatriation order.

The SEC's vigorous enforcement efforts has caused Jupiter to become unemployable in the securities industry since 1997. Nonetheless his familial responsibilities have not correspondingly diminished. His family and extended family consist of three adult sons and two minor children from a second marriage, in addition to himself and his wife, Barbara.[2] Recognizing the financial burdens that he would have to bear, Jupiter attempted to resolve this case in all respects *years ago*. Indeed in about November 2002, Judge Smalkin ordered the parties to attend mediation for the purpose of globally settling both the injunctive and the disgorgement/civil penalty elements, and finally putting the case to rest. This mediation occurred at a time when Jupiter's financial condition was substantially healthier than it is today. At the time of the mediation the SEC was aware of the existence of the Jupiter Family Trust, the Trophy Trust and the Dean J. Jupiter trusts (collectively the "Jupiter Trusts"). Needless to say, the monetary part of the case was not resolved, although Jupiter did agree and consent to Final Judgment of Permanent Injunction, which was entered by the Court on January 17, 2003. That Final Judgment did not include any repatriation order.

**The Creation of the Jupiter Trusts.** The SEC moving papers filed on May 2, 2005, attempt to taint the bona fides for the creation of the various Jupiter Trusts in order to gain some equitable leverage in its effort to repatriate these assets to the U.S. However, the evidence shows that the creation of the various trusts by Jupiter and his wife, was neither unusual or unpatterned, and that the trusts were not created to expressly defeat the SEC's claims. The evidence shows that the trusts were created for well-recognized investment, estate planning and asset protection purposes.

The first trust in time, the Jupiter Family Trust, was formed in the early 1990's. There is no evidence in the record that, but for the SEC's Complaint allegations, that the timing of this trust

---

[2] Two of his sons are now in military service; the third is incarcerated having received a life sentence for homicide. All members of Jupiter's family-wife and children-have been named as relief defendants.

coincide with or overlap the alleged SEC fraud. Moreover, the Dean J. Jupiter trust was not

funded with commissions received as result of the Aon account. In fact, according to the testimony

of Lawrence Legal, the Jupiter accountant, the sole evidence on this point, was that the trust was

never used.[3]

A second trust, the Dean J. Jupiter Trust, was an irrevocable trust formed on June 24, 1997,

well before the SEC initiated its action in 2000, and before Jupiter had any notice that the SEC was

even investigating his alleged wrongdoing. This trust, formed under the laws of the Commonwealth

of the Bahamas, is irrevocable, and places unbridled discretion and absolute control in the trustees,

Ansbacher Bahamas, Ltd., a Bahamian corporation  When asked by the SEC as to the purpose for

the formation of this trust, Jupiter's accountant, Larry Legal testified:

> Q. Was that what he told you–well, let me back up. When was the Dean J.
> Jupiter Trust created?
> A. 1997.
> Q. And the objective you just described to me for the creation of the Dean J.
> Jupiter Trust, was that the objective at the time the trust was created?
> A. Yes. We had received information from Bahamian investment advisors that
> they could provide a high return on investment, and Dean wanted to set up funds
> for the benefit of his children, long-term estate tax planning, traditional standard
> maneuvers, and told me that the was going to get a substantial return on his
> investment, which he never did.
> Q. Did you at any time ask him if his objectives for the Dean J. Jupiter Trust had
> changed from what he told you at the time it was created?
> A. We discussed it many times, the issue of what his objectives were, and his
> objectives were to provide long-term transfer of net worth to his children and to
> get a high return on his investment because he had–was not doing so well with
> this investments through Merrill Lynch in the U.S.[4]

Clearly then, the evidence shows that the purpose of the Dean J. Jupiter trust was not to defeat the

---

[3] Depo. Lawrence Legal, May 5, 2004 ("Legal Depo.") p. 59. (attached as Exhibit A)

[4] Legal depo. P. 37. Regarding asset protection, Legal testified that there were conversations with
Bahamian officials that their bank privacy laws protected his investments from any outside jurisdiction. There is no
testimony that Jupiter sought to hide his assets, or that the trust was set up specifically for that reason. Moreover,
there is no time indicated as to when these conversations occurred. *See*, Legal Depo. pp.37-38.

believe differently. The fact that the record shows that Jupiter may have been told that this trust had asset protection benefits, was not the driving force behind its formation, and is of no moment. It is also important to note that the existence of this trust was known to the SEC prior to and at the time of the January 2003 mediation, yet no action was taken at the time to obtain a repatriation order.

The third trust was the Trophy trust, formed in April 2002. As in the case of the Dean Jupiter Trust, the existence of this trust was known to the SEC at and prior to the time of the January 2003 mediation.[5] The Trophy trust has characteristics similar to that of the Dean J. Jupiter Trust, except that it was formed under the laws of the Turks & Caicos Islands, and its trustee was First Financial Caribbean Trust Company. This trust was primarily funded (from a homestead trust) with \$1.2 million in proceeds realized from the sale of the Jupiter home in Florida which was owned jointly by Jupiter and his wife. The Florida law provides for a homestead exemption as follows:

(a) There shall be exempt from forced sale under process of any court, and no judgement, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person:

(1) a homestead, if located outside a municipality, to the extent of one hundred sixty acres of contiguous land and improvements thereon, which shall not be reduced without the owner's consent by reason of subsequent inclusion in a municipality; or if located within a municipality, to the extent of one-half acre of contiguous land, upon which the exemption shall be limited to the residence of the owner or the owner's family; ...(Fla. Const. Art. X, § 4)[6]

---

[5] Curiously, if the SEC believed that the purpose of the Jupiter Trusts was to secrete his assets, it has never, previous to this motion, sought to freeze or enjoin (a common SEC practice) his assets before he left the U.S. *See In re Feit & Drexler, Inc.*, 760 F.2d 406 (2nd Cir. 1985)

[6] *In Re Englander*, 95 F.3d 1028, 1031 (11th Cir. 1996), the court recognized that the Florida Constitution provides exemption protection to real property which is located within a municipality so long as the property is limited to one-half acre of contiguous land. There are no limitations upon the cost, size, or construction of the

liberal construction of the exemption and the exemption should be liberally construed in the interest of the family home. In *Havoco of America, Ltd. v. Hill*, 790 So.2d 1018, 1021 (Fla. 2001), the Florida Supreme Court held that it was unwilling to imply an exception for homesteads acquired through criminal or immoral conduct:

> Consequently, in light of the historical prejudice against forfeiture, the constitutional sanctity of the home, and the rules of construction requiring a liberal, nontechnical interpretation of the homestead exemption and a strict construction of the exceptions to that exemption, we hold that article X, section 4 of the Florida Constitution prohibits civil or criminal forfeiture of homestead property. (at p. 1021)

> ***

> Most significantly, article X, section 4 expressly provides for three exceptions to the homestead exemption. Forfeiture is not one of them. According to the plain and unambiguous wording of article X, section 4, a homestead is only subject to forced sale for (1) the payment of taxes and assessments thereon; (2) obligations contracted for the purchase, improvement or repair thereof; or (3) obligations contracted for house, field or other labor performed on the realty. Under the rule "expressio unius est exclusio alterious"--the expression of one thing is the exclusion of another--forfeitures are not excluded from the homestead exemption because they are not mentioned, either expressly or by reasonable implication, in the three exceptions that are expressly stated. (at p.1022)

The SEC contends that these funds, but for their placement in the Trophy trust, would be exposed to creditors is not accurate. These funds, having been derived from Florida "homesteaded property" continue to enjoy the protection from creditors granted under the Florida constitution to homesteaded property, protection which federal law recognizes. Moreover, even if that protection was lost over time, the funds would remain protected due to the status of their ownership by the Jupiters' as tenants by the entireties. As such, at a minimum, one-half of the value was owned by

---

residence. Id. Florida case law dictates that the homestead exemption laws be liberally applied to the end that the family shall have shelter and shall not be reduced to absolute destitution. Id.

Q. Did Mr. Jupiter tell you why that was set up that way?
A. I was very much involved with it. Barbara Jupiter and her rights to the proceeds of which there were many rights that she had. And she imposed upon me to find the right attorney to do the right things with the proceeds, and we retained counsel, and counsel set up homestead trust.

As shown above, Jupiter has now settled with the SEC on both the injunctive and monetary aspects of the litigation in the form of disgorgement, prejudgment interest and civil penalties. Jupiter has faithfully complied with all of the Court's requests and willingly has cooperated with the SEC to reach such settlement.

Still, the SEC seeks to go beyond the spirit of cooperation and further handicap Jupiter. Specifically, the SEC's Motion demands the entry of a repatriation order against Jupiter based on three allegations: (a) that the Court permitted the SEC to amend their Complaint to seek a repatriation order, (b) that Jupiter has allegedly "transfer[ed] some, if not the remainder, of his assets to various trusts," and (c) that "Jupiter's own conduct warrants the entry of a repatriation order against him."

Jupiter asks this Court to reject at this time the SEC's Motion for an Entry of a Repatriation Order, because as noted, the evidence shows that the Jupiter Trusts were not created to defeat the SEC's claims, the SEC has waited far too long to seek such an order, the SEC has not shown that such an Order is essential to enforcing the consented to judgment, and because Jupiter has cooperated in the litigation in this case.

## Argument

### A.    *The SEC's Predicate for Repatriation Cannot Stand Scrutiny*

The key element to the SEC motion is that, since the beginning of the alleged scheme, Jupiter

---

[7]Legal Depo. p. 57

has transferred assets to off-shore trusts, how defeat the SEC's collection efforts, possibly afraid again at this late date that it will be unable to collect upon judgment, the SEC now seeks to repatriate Jupiter's assets without showing a real need for such an order. Yet, as described above, each of the trusts has had a separate and legitimate purpose other than frustrating the SEC's ability to collect on its judgement—a judgment that is only now being entered. Indeed, two of the three trusts in question were created prior to the institution of the SEC's investigation and thus clearly prior to commencement of this suit. Only the SEC's spin on the accountant's deposition (the only real evidence of Jupiter's intent) supports the contention that the primary purpose of the trusts was to "[a]void attachment by the United States...". As this Memorandum set forth above, the evidence shows that the real purpose for the establishment of the Jupiter Trusts was to enhance their investment potential, provide security for his family, and to protect the homestead assets of Barbara Jupiter (which already had the protection from creditors by virtue of the Florida Constitution).

Moreover, Jupiter's willingness to reach a settlement and agree to the SEC's proposed figures for disgorgement, interest and even civil penalties plus the SEC's failure to demonstrate a history of non-payment or Jupiter's unwillingness to accept this financial obligation, adds additional reasons why the repatriation request should be denied. [8]

The truth of the matter is that the SEC's predicate for repatriation cannot stand scrutiny. An assumption of Jupiter's motives and an unfounded fear in the inability to collect upon a judgment are not sufficient reasons to justify the repatriation of Jupiter's assets.

### B.    A Repatriation Order is Premature.

Jupiter does not concur in the SEC's position that this conduct translates into a repatriation order. We acknowledge that the case law cited by the SEC support the rule that the Court has the

---

[8] To the contrary, as noted, Jupiter was prepared to make a monetary settlement at mediation which the SEC rejected. Jupiter was also included in the settlement of the civil action between Aon and First Union Bank, Jupiter's employer.

discretion to order the repatriation of assets under the appropriate circumstances. In the cases cited, there was a demonstration by the government that the party from whom repatriation was sought intentionally refused and devised means to avoid the satisfaction of the judgment. There is no evidence of this intent. In fact, to the contrary, Jupiter has cooperated in virtually every aspect of bringing this case to closure. This included his consent to the permanent injunction, his consent and stipulation to disgorgement and civil penalty, and a final judgement. [9] All of this came on the heels of a good faith attempt to mediate and settle the case more than two years ago. There has been no monetary judgement to date–and consequently there has been no attempt by the SEC or the government, to collect on the judgment. Allowing for repatriation order is thus, at a minimum premature, if not completely unwarranted.

In the cases selected by the SEC, there is a clear history of non-compliance with an existing order and/or bad faith on part of the Defendants. For example, in *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985), the Court explains:

> The district court found that Violet had engaged in "numerous"[citation omitted] and *"substantial efforts to hide and secrete assets." (Emphasis added)Id.* at 358. This finding was amply supported by the record, which included evidence of Violet's bond purchases and Swiss bank accounts, along with her repeated sworn testimony that she had no such assets. Accordingly, the court's conclusion that without injunctive relief an eventual money judgment was likely to be "ineffectual" should not be disturbed.

This case does not merely hinge on the fact that Violet had foreign accounts, but instead that

---

[9] Based on the facts delineated above, Jupiter has complied with all of the Court's Orders. Specifically, the Court, in their Order of Permanent Injunction ("Order") dated January 17, 2003, commanded:

> IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant disgorge all ill-gotten gains received by him as a result of the conduct alleged in the SEC's Complaint, plus prejudgment, interest on those amounts. This Court will set the specific amount of disgorgement, and will determine whether to impose civil penalties on Defendant, and in what amount, in a separate hearing upon due notice and motion by the SEC. At that hearing, the issues will be limited to determining (i) the amount of disgorgement to be ordered and (ii) whether civil penalties should be imposed on Defendant, and the amount of any such penalties.

she received the Court by denying of their existence, therefore demonstrating "substantial efforts to hide and secrete assets." Such is not applicable in this case. Jupiter has not only disclosed the existence of his accounts but has also provided the SEC with financial information. The SEC also had the ability to subpoena Jupiter's individual and fiduciary tax returns. Ultimately, they did depose his accountant–four years following the filing of the complaint. Clearly, there is no evidence of "substantial efforts to hide and secrete assets."

The SEC also cites to ***FTC v. Affordable Media, LLC***, 179 F.3d 1228 (9th Cir. 1999), for the proposition that the defendants therein were subject to contempt for failing satisfy their burden of demonstrating the impossibility of repatriating assets placed in a foreign asset protection trust *after a repatriation order was issued*. This case is inapplicable. Here no order has yet to be issued. Moreover, in ***Affordable Media***, the Court determined that the purpose of the trust was to alienate the trust assets from the government. No such finding has been made here, nor should it be made. The evidence before this court is to the contrary. Material independent reasons demonstrate the formation of the trusts, reasons clearly unrelated to asset protection.

### Conclusion

Based upon the foregoing, Defendant Dean Jupiter requests the Court deny the SEC's Motion to Enter an Order for Repatriation of Assets.

ant to Local Rule 105.9, the undersigned certifies that one or both of them have consulted

nsel in a good faith attempt to reach a resolution of this motion.

By:

/s/ Allan M. Lerner

_____

Allan M. Lerner, Esq.

2888 East Oakland Park Boulevard

Fort Lauderdale, FL., 33306

954-563-8111

954-563-8522 (fax)

/s/ Robert W. Biddle

_____

Robert W. Biddle, Esq.

Nathans & Biddle, LLP

120 East Baltimore Street, Suite 1800

Baltimore, MD 21202

410-783-0272

410-783-0518 (fax)

Dis. Md. Bar # 10761

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion has been filed, pursuant to Fed. R. Civ. P. 5(a), electronically this 27th day of May, 2005.  Notice of this filing will be sent electronically to Carolann Gemski, counsel for Plaintiff Securities and Exchange Commission by operation of the Court's electronic filing system.   Parties and interested persons may access this filing through the Court's system.  Copies of any bulky attachments longer than 15 pages will be filed with the Clerk of the Court in hardcopy form.

/S/ *Robert W. Biddle*

Robert Biddle, Esq.